# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| STACEY ZULINSKI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-630-SLR |
| | ) |
| MICHAEL J. ASTRUE,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

Stephen A. Hampton, Esquire of Grady & Hampton, L.L.C., Dover, Delaware. Counsel for Plaintiff.

Colm F. Connolly, Esquire, United States Attorney for the District of Delaware and Patricia A. Stewart, Esquire, Special Assistant United States Attorney, of the Social Security Administration, Philadelphia, Pennsylvania. Counsel for Defendant. Of Counsel: Michael McGaughran, Esquire and Nicholas R. Cerulli, Esquire of the Social Security Administration, Philadelphia, Pennsylvania.

## MEMORANDUM OPINION

Dated: March 14, 2008
Wilmington, Delaware

---

[1]On February 12, 2007, Michael J. Astrue replaced Jo Anne B. Barnhart as Commissioner of Social Security.

ROBINSON, District Judge

## I. INTRODUCTION

Stacey Zulinski ("plaintiff") appeals from a decision of Michael J. Astrue, the

Commissioner of Social Security (the "Commissioner"), denying her application for

disability insurance benefits ("DIB") and supplemental security income ("SSI") under

Title II of the Social Security Act, 42 U.S.C. §§ 401-433. Plaintiff has filed a motion for

summary judgment asking the court to award her DIB benefits or, alternatively, remand

the case for further proceedings. (D.I. 17) Defendant has filed a cross-motion for

summary judgment, requesting the court to affirm his decision and enter judgment in his

favor. (D.I. 21) The court has jurisdiction over this matter pursuant to 42 U.S.C.

§ 405(g).[2]

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for DIB and SSI on June 25, 2003,[3] alleging disability since

October 1, 2001 due to osteogenesis imperfecta[4] ("OI") and osteoporosis.[5] (D.I. 16 at

_____

[2] Under § 405(g),

[a]ny individual, after any final decision of the Commissioner of Social
Security made after a hearing to which he was a party . . . may obtain a
review of such decision by a civil action commenced within sixty days after
the mailing to him of notice of such decision . . . . Such action shall be
brought in the district court of the United States for the judicial district in
which the plaintiff resides . . . .

42 U.S.C. § 405(g).

[3] Plaintiff previously applied for DIB in 2002 but did not pursue her claim beyond
the first level of review. (D.I. 16 at 128-40)

[4] Osteogenesis imperfecta is a genetic bone disorder sometimes known as brittle
bone disease. Type 1 is characterized by an insufficient amount of collagen, which

44-46, 56, 73) At the time of the ALJ's decision, plaintiff was 22 years old. Plaintiff's claim was denied initially on October 8, 2003 (id. at 31-35) and on reconsideration on November 7, 2003 (id. at 36-41). Plaintiff requested a hearing before an administrative law judge ("ALJ") (id. at 42), which was conducted on September 22, 2004 (id. at 228). After receiving testimony from plaintiff, plaintiff's husband and mother, and a vocational expert ("VE"), the ALJ decided on September 24, 2004 that plaintiff could perform other sedentary work that accomodates her postural and environmental limitations. (Id. at 12-24) Plaintiff's subsequent request for review by the Appeals Council was denied. (Id. at 5-10) On October 11, 2006, plaintiff brought the current action for review of the Commissioner's final decision denying plaintiff DIB and SSI. (D.I. 2)

**B. Medical Evidence**

On October 10, 2001, plainiff presented to her primary care physician, Dr. Charles A. Esham, with hip pain, for which Dr. Esham advised to use two Tylenol 3 caplets and Advil. (D.I. 16 at 154) Plaintiff complained of persistent pain on October 23, 2001 despite taking Percocet. (Id.) A MRI of the left hip on October 24, 2001 showed a "functional cyst," but no evidence of a stress fracture. (Id. at 151)

On January 10, 2002, plaintiff was evaluated by Dr. Evan H. Crain of First State Orthopedics in Newark, Delaware for a painful left foot caused by a fall down two steps. (Id. at 110) Dr. Crain noted that prior to 2002, plaintiff's OI caused her to suffer a wrist

---

may cause bones to fracture easily, slight spinal curvature, loose joints, and poor muscle tone.

[5]Osteoporosis is a bone disease also leading to an increased risk of fracture; it is characterized by a reduced bone mineral density.

fracture and patella fracture, each with significant trauma.  (Id.)  X-rays taken at the
hospital for the current injury were read negative.  A bone scan performed on January
9, 2002 "showed an increased uptake along the base of the 5th metatarsal[6]."  (Id.)
Though x-rays did not show a fracture, Dr. Crane concluded that plaintiff suffered "a
very small fracture probably at the base of the 4th metatarsal."  (Id. at 148, 109)  He
also indicated that plaintiff's bone scan "is definately hot," particularly in this area.  (Id.)
At that time, Dr. Crane estimated a four to six week recovery time for someone in
plaintiff's condition.  (Id.)  The bone scan report also indicated that a three-phase study
of plaintiff's hips was unremarkable.  (Id. at 149)

Plaintiff presented to Dr. Esham on February 22, 2002 with increased lower back
pain that caused her to have to "lie down a lot."  (Id. at 145)  A MRI taken February 28,
2002 was negative for joint problems or fracture and otherwise unremarkable, except
for a low signal band possibly due to plaintiff's OI.  (Id. at 146-47)

Dr. Esham changed plaintiff's pain medication on March 12, 2002, and noted
that she complained of hip pain on May 8, 2002; Demoral was prescribed for pain.  (Id.
at 145)  Plaintiff presented to the Christiana Hospital emergency department on May 9,
2002 with complaints of severe hip pain preventing her from walking.  (Id. at 115-17)
Plaintiff received three administrations of Diluadid for pain.  (Id. at 119)

On May 29, 2002, Dr. Esham noted that plaintiff was "still having [a] hip problem,
worse when on [her] period," and that plaintiff was constipated.  (Id.)  He also noted that
plaintiff was "not taking pain pills."  (Id.)

---

[6]A bone in the foot.

3

At the Commissioner's request, plaintiff saw Dr. Irwin L. Lifrak, M.D. for an examination on October 15, 2002. (Id. at 122)  During her examination, plaintiff complained of pain in her left hip, mid back, both wrists, fingers, and both knees. (Id.) Dr. Lifrak noted that plaintiff first began to experience these symptoms two years before his examination. (Id.)  Plaintiff described her pain as variable with the most intense periods occurring in cold and damp weather and early morning and late evening hours. (Id.)  Plaintiff stated at that time that she was able to walk and climb stairs, "sit for a total period of up to seven hours," "stand for a total period of up to one hour," and was able to lift about 10 pounds with each hand. (Id.)  Upon examination, Dr. Lifrak described plaintiff as follows:

> [I]n no acute physical distress who ambulates without the aid of any assistive device, whose gait and station are normal, who was able to get on and off the examining table without assistance, and was able to walk on both her heels and toes, as being able to perform tandem gait maneuvers, and maneuvers of the hands requiring dexterity such as picking up coins and paper clips with either hand, without difficulty.

(Id. at 123)  Dr. Lifrak noted a 5/5 grip strength for plaintiff's upper extremeties and a 5/5 muscle tone for plaintiff's lower extremities. (Id.)  Dr. Lifrak also noted that plaintiff had a mild degree of scoliosis and a reduced range of motion in her hips, without pain or muscle spasm. (Id. at 124)  Plaintiff's degree of flexion and rotation of her left hip measured only 10 degrees less than that of her right; her spinal flexion was generally not decreased. (Id. at 127)  Dr. Lifrak diagnosed OI and degenerative disc disease. (Id. at 124)  In his opinion, plaintiff retained the ability to perform sedentary work. (Id. at 124-25)

On October 2, 2003, plaintiff attended a second consultative examination at the

4

Commissioner's request. Dr. Ganesh Balu indicated that plaintiff reported bilateral knee pain, ankle pain, and hip pain associated with neck and low back pain over several years. (Id. at 156) He noted that plaintiff had narcotics for use on an as-needed basis, but was not taking any medications at the time. (Id.) Dr. Balu found that plaintiff's spinal and musculoskeletal examinations were normal as was an examination of plaintiff's joints. (Id. at 157) It was Dr. Balu's impression that plaintiff "suffers from diffuse musculoskeletal pain secondary to osteogenesis imperfecta leading to chronic pain." (Id.)

On March 10, 2004, plaintiff presented to First State Orthopaedics, P.A. with a "severe inverted injury" to her right ankle that occurred the day before. (Id. at 183) X-rays were negative. (Id.) After a physical examination, she was diagnosed with a "right ankle third degree ankle sprain," given an Aircast, directed to use crutches as needed, and prescribed physical therapy. (Id.) It was noted that plaintiff "should do well with continued conservative treatment." (Id.) On April 2, 2004, it was noted that plaintiff's ankle was "markedly improved" and that plaintiff had some "mild tenderness" but could "bear full weight." (Id. at 182)

On June 15, 2004, plaintiff was evaluated by Dr. Jay Shapiro of the OI clinic at Kennedy Krieger Childrens Hospital in Baltimore, Maryland. (Id. at 189) Dr. Shapiro noted that plaintiff's last fracture (to a metatarsal) occurred about two years prior. (Id.) He also noted that plaintiff "is ambulatory but occasionally uses crutches because of back and hip pain," and complains of "soreness or stifness associated with some swelling of her hands." (Id.) A year and a half prior, plaintiff took Actonel for pain for several months but stopped due to gastric intolerance. (Id.) Dr. Shapiro noted that

5

plaintiff's prior density studies revealed plaintiff was "observed to have lost 2 inches in height over the past 4 years." (Id. at 190) Dr. Shapiro also noted that these studies "show significant bone loss involving the lumbar spine and the hip; the osteoporosis is more marked in the lumbar spine than the hip, and over the last 2 years, there have not been major changes in bone density." (Id.)

Upon physical examination, Dr. Shapiro noted that "[t]he cause for back pain is not clear," though January 2002 bone scans "show a hot spot in the left sacrum and also in the metatarsal." (Id. at 190-91) Dr. Shapiro recommended a physical therapy consult, stating "[i]t is very likely that significant muscle strengthening exercises would help diminish some of her pain." (Id. at 191)

Dr. Shapiro noted on July 21, 2004 that plaintiff's June 2004 bone density study revealed a more more marked decrease in values in the lumbar spine than in plaintiff's hip. (Id. at 218) His diagnoses were: (1) type 1 OI; (2) "mild upper thoratic scoliosis and kyphosis"; and (3) "hip pain and sacral pain possibly of an osteoarthritic type." (Id. at 217)

A MRI taken on August 30, 2004 at the request of Dr. Shapiro was negative for both of plaintiff's knees. (Id. at 197) "[S]ome mild congenital central canal stenosis[7] of the lower lumbar spine" was noted. (Id. at 197-98) A bulging disc was noted in the lower back and in the neck. (Id. at 198) An "essentially negative study" of the thoratic spine was reported. (Id.)

_____

[7]Generally, a condition in which the spinal canal narrows and compresses the spinal cord and nerves, often occurring due to the natural process of spinal degeneration occurring with aging.

6

On or about August 23, 2005, plaintiff saw Dr. Eric R. Tamesis of Tamesis

Rheumatology Medicine of Delaware, P.A. for evaluation of complaints of joint pain and

episodic swelling. (Id. at 209) Plaintiff's complaints at that time included: (1) knee

swelling worse with prolonged standing; (2) shoulder pain worse when laying on her

side; (3) weak hand grip; (4) hip pain which worsens upon standing; (5) low radiating

back pain; (6) "stiffness lasting half an hour [or] worse in the mornings and with any

periods of inactivity" that improves with a hot shower; and (7) chronic fatigue. (Id.) Dr.

Tamesis's assessment after examination was as follows:

> 23 [year old] female with history of [OI], with diffuse polyarthralgis and
> polymyalgias. She has chronic neck and low back pains, with evidence of
> lumbar spondylosis, and stenosis seen on MRI of the LS spine. Certainly her
> joint pains[,] particularly the neck and back pains[,] may be related to her
> underlying condition. Her history and examination can also be suggestive of
> Fibromyalgia syndrome.[8] With the worsening of joint pains, an inflammatory
> arthritis can also be considered. . . .

(Id. at 210) Dr. Tamesis prescribed Ultracet and ibuprofen for pain. (Id.) At her follow

up on September 12, 2005, Dr. Tamesis noted that plaintiff complained of stiffness

lasting up to two hours, some swelling of her fingers and knees, poor sleep and

morning fatigue. (Id. at 205) He also noted that plaintiff stated her "medications don't

help much" but were tolerated; he suggested continuing her present medications. (Id.)

Plaintiff followed up with Dr. Shapiro on January 20, 2006. (Id. at 202) At that

time, Dr. Shapiro noted that plaintiff had "multiple musculoskeletal complaints which

involve the left side of the neck without radiation, and some discomfort in the left

shoulder, her ankles, knees, and low back." (Id.) Plaintiff described her own pain on a

---

[8]A chronic pain disorder.

7

scale of 9/10 in terms of her daily activities. (Id.) Plaintiff's medications included two

800 mg ibuprofen twice daily, one or two tablets of Vicodin daily, Elavil[9] at nighttime,

and vitamin supplements. (Id.) Dr. Shapiro noted no spinal pain, a tender left wrist (the

site of a previous fracture), and some discomfort in manipulating the left ankle but not

the right. (Id.) Dr. Shapiro diagnosed type 1 OI and "musculoskeletal syndrome,

possibly fibromyalgia"; he sought to order a bone scan, noting that the "scan done

several years ago may have shown hot spots, but that is not clear." (Id. at 202-03) His

purpose was to "rule out discrete joint involvement or an inflammatory process." (Id. at

203) The record does not indicate the result(s) of this testing.

### B. Medical Opinions Regarding Residual Functional Capacity

On October 23, 2002, following plaintiff's consultive examination with Dr. Lifrak, a

state agency physician reviewed plaintiff's medical records and noted that plaintiff could

occasionally carry 20 pounds, frequently carry 10 pounds, sit and/or walk for about 6

hours in an 8-hour workday, and could push or pull without limitation. (Id. at 131) He

concluded that plaintiff retained the capacity to perform light work that avoids

concentrated exposure to extreme cold or hazards. (Id. at 134, 137)

A report by Dr. Ronald J. Horvath of the Delaware Office of Medical Evaluation

for Disability Determination Services ("DDS"), is of record and dated December 16,

2002. (Id. at 140) Dr. Horvath cited plaintiff's records from her October 15, 2002

examination by Dr. Lifrak, 2001 and 2002 MRIs, May 2002 x-rays, and January 2002

bone scans, as well as plaintiff's statements that she can do light household chores,

---

[9]Commonly used as an antidepressant.

limited walking and lifting, and drives short distances and shops. (Id.) In view of this evidence, Dr. Horvath stated that the "[residual functional capacity] of the DDS is reasonable." (Id.)

On October 7, 2003, following plaintiff's consultive examination with Dr. Balu, a second state agency consultant reviewed plaintiff's medical records and noted that plaintiff could occasionally carry 20 pounds, frequently carry 10 pounds, sit and/or walk for about 6 hours in an 8-hour workday, and could push or pull without limitation. (Id. at 160) He concluded that plaintiff could perform light work that accomodates plaintiff's postural limitations and avoided concentrated exposure to extreme cold or vibration. (Id. at 161, 163, 166) Each of these state agency opinions were executed prior to plaintiff's June - September 2004 period of treatment with Dr. Shapiro.

On September 9, 2004, Dr. Shapiro signed a two paragraph Medical Statement indicating that: (1) plaintiff had been under his care for approximately three months; (2) plaintiff has "evidence of osteoporosis [and] degenerative disc disease in the lumbar vertebral bodies"; (3) plaintiff has significantly diminished bone density; (4) plaintiff has suffered "numerous fractures" and "has soreness and stiffness in her back, hips, knees, ankles and hands," in addition to swelling of her extremeties; and (5) as a result of plaintiff's OI, it is Dr. Shapiro's belief that "it is unlikely that [plaintiff] can sustain full time, everyday work on a regular basis," which inability "is likely to last for at least the next 12 months." (Id. at 199B) On September 11, 2004, Dr. Esham signed a two paragraph Medical Statement listing plaintiff's ailments and indicating that, due to plaintiff's OI, it was his belief that plaintiff is "unable to sustain full time, everyday work on a regular basis," and this inability "has existed since at least the beginning of 2002."

9

(Id. at 199A)

### C. Plaintiff's Vocational Background

Plaintiff has an eighth-grade education. (Id. at 77, 233)  Her past work experience includes jobs as a cashier, customer service clerk, and fast food worker. (Id. at 235-36)  Plaintiff's most recent employment was as a revenue attendant for the State of Delaware, where plaintiff supervised fee collections at a state park. (Id. at 74, 234)  In her disability application, plaintiff described this position as entailing 2 hours of walking per day, sitting 6 hours per day, frequently lifting 10 pounds of weight, and lifting heavier boxes of paper. (Id. at 74-75)  During the ALJ hearing, plaintiff stated that as a revenue attendant she took reservations over the telephone and wrote them down, counted people in and out, and supervised a gift shop which had about five customers per day. (Id. at 234, 248)  She stated that she did not do any lifting more than a few pounds and did more sitting during the day than standing or walking. (Id. at 235)

Plaintiff worked for the State from April 2000 to December 2001, at which time she stopped working due to pain. (Id. at 74)

### D. Hearing Before the ALJ

#### 1. Plaintiff's testimony

At the hearing, plaintiff testified that she began having trouble performing her revenue attendant job before she quit in 2001.  Plaintiff would take frequent breaks to lay down in her car or to stretch her back due to pain. (Id. at 247)   She would leave about lunch time, and could work only about two hours before needing a 15 minute break. (Id.)  At the time she quit in 2001, plaintiff was working only two or three days

10

per week. (Id.)

Plaintiff testified that she takes pain medication for her back, knees, hips and ankles, but this pain is dulled to only about a 6/10 with medication. (Id. at 237-38) Her ankles and hands swell up and she "can't grab things." (Id. at 238) Her right shoulder has pain and she cannot lift her arm high. (Id.) Plaintiff stated that she "can't open jars" and can only hold pencils for a short period of time. (Id. at 239) She has to hold a coffee cup with two hands. (Id.) She gets some negative side effects with medication, such as feeling "dopy, constipat[ed], dizzy" or "very goofy," so she sometimes tries to limit taking them until nighttime. (Id. at 240) Plaintiff stated that laying down helps with pain a lot. (Id.)

Plaintiff also testified that she can walk outside for only about 10 to 15 minutes, go up one flight of stairs before requiring a break, stand only for about 20 minutes, and sit for about 45 minutes before her hips and back "really start bothering [her]." (Id. at 241) She stated that she can lift five pounds, bend at the waist with some pain, kneel with some knee pain, and pick items up off of the floor. (Id. at 241-42) Plaintiff sleeps for three to four hours at a time before having back and hip pain. (Id. at 242) Plaintiff stated that she can do some chores such as sweeping, but that her husband helps with chores and grocery shopping which can hurt her back. (Id. at 243-44) Plaintiff can do laundry and move one load at a time upstairs before resting for 15 minutes. (Id. at 243) Plaintiff has to lay down for about 20 minutes after 10 minutes' worth of dishwashing. (Id. at 245) Generally, she can perform household tasks for "[m]aybe 10, 15 minutes [before having] to lay down with [her] feet up about 45." (Id. at 249) She cannot walk all the way around her house without stopping. (Id. at 250)

11

Plaintiff has a daughter, who was three years old at the time of the hearing.

Plaintiff testified that she, her husband, and her mother share child care responsibilities.

(Id. at 244) Plaintiff stated that she has "a very hard time" lifting her child "but when

[she] need[s] to" she does it. (Id.) She can run simple errands twice per week. (Id.)

She tries not to drive longer than 10 minutes because "it really hurts [her] hips [and]

knees." (Id. at 246) Plaintiff takes her daughter out for walks occasionally. (Id. at 245)

Plaintiff testified that, on average, she lays down "between three and four hours a day,

maybe more." (Id. at 249)

## 2. Testimony of Plaintiff's Witnesses

Plaintiff's husband and mother testified on her behalf in a manner generally

consistent with plaintiff's testimony. Plaintiff's husband testified that plaintiff has trouble

sleeping, can sustain activity for 10 to 30 minutes, rests about three hours per day, and

spends six hours out of an eight hour workday resting. (Id. at 256-57) Plaintiff's mother

testified that plaintiff was active prior to her pregnancy, and even did a 25 mile biking

event, but plaintiff's problems increased with pregnancy and she has been in decline

since that time. (Id. at 258-60)

## 3. Vocational expert testimony

The hypothetical question that was asked by the ALJ was as follows:

Now if we were to take a hypothetical individual who is about the claimant's
stated age at onset, which I believe was 20 or 21. This individual has an eighth
grade education and the work history that you have just cited. There are certain
underlying impairments and these impairments cause certain limitations and
these are standing, walking about two hours in an eight hour work day, sitting
about six in an eight hour work day. This would be – this person would have the
need to have a sit/stand option during the day, during the work day lifting at a
sedentary level of exertion. This individual would have postural limitations, never

12

climbing a ladder, a rope or scaffold. All of the other posturals are occasional. And this should avoid concentrated exposure to extreme cold and to hazards due to medication side effects. Would there be any work, past relevant work of the claimant that such a person could do with those limitations, in your opinion?

(Id. at 262-263) Based on this hypothetical, the VE testified that plaintiff could still

perform her job as a park aid, which was a sedentary job as she described it. (Id. at

263) The VE also testified that plaintiff could perform other jobs, such as an addresser

for the Department of Transportation,[10] a surveillance system monitor,[11] and a call out

operator.[12] (Id. at 263-64)

When plaintiff's counsel further limited the hypothetical, the VE testified that all

jobs would be eliminated if plaintiff could only work half an hour before having to lie

down for 45 to 60 minutes. (Id. at 264) The VE also stated that, if plaintiff could only sit

for 45 minutes before having to lie down for 45 minutes, this would also eliminate all the

jobs he had mentioned. (Id. at 265) Taking all of the limitations plaintiff testified to at

the hearing in total, the VE agreed that she would not be able to perform any of the

jobs. (Id. at 265-66)

## III. STANDARD OF REVIEW

---

[10]According to the VE, there are 690 such jobs in Delaware, and 572,000 jobs in the national economy. (D.I. 16 at 263)

The VE acknowledged that a sit/stand option is not specifically referenced for the addresser job; he testified that, based upon the performance of the essential job duties, "a person could perform the essential functions whether they were sitting or standing in changing positions." (Id. at 264)

[11]According to the VE, approximately 6,000 such jobs exist in Delaware, and 324,000 exist nationally. (D.I. 16 at 263-64)

[12]According to the VE, approximately 6,000 such jobs exist in Delaware, and 318,240 exist nationally. (D.I. 16 at 264)

13

Findings of fact made by the Commissioner are conclusive, if they are supported by substantial evidence.  Accordingly, judicial review of the Commissioner's decision is limited to determining whether "substantial evidence" supports the decision.  See Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986).  In making this determination, a reviewing court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record.  See id.  In other words, even if the reviewing court would have decided the case differently, the Commissioner's decision must be affirmed if it is supported by substantial evidence.  See id. at 1190-91.

The term "substantial evidence" is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence.  As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Pierce v. Underwood, 487 U.S. 552, 565 (1988).  The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56.  The inquiry performed is the threshold inquiry of determining whether there is the need for a trial–whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), "which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.  If

14

reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-51 (1986) (internal citations omitted). Thus, in the context of judicial review under § 405(g), "[a] single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)–or if it really constitutes not evidence but mere conclusion." See Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986) (quoting Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of the plaintiff's subjective complaints of disabling pain, the Commissioner "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." Matullo v. Bowen, 926 F.2d 240, 245 (3d Cir. 1990).

## IV. DISCUSSION

### A. Regulatory Framework

Social Security Administration regulations incorporate a sequential evaluation process for determining whether a claimant is under a disability. 20 C.F.R. § 404.1520. The ALJ first considers whether the claimant is currently engaged in substantial gainful activity. If she is not, then the ALJ considers in the second step whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third

inquiry is whether, based on the medical evidence, the impairment meets the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1 (1999), which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a listed impairment, then the ALJ assesses in the fourth step whether, despite the severe impairment, the claimant has the residual functional capacity to perform her past work. If the claimant cannot perform her past work, then step five is to determine whether there is other work in the national economy that the claimant can perform. Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000) (citing 20 C.F.R. § 404.1520). If the ALJ finds that a claimant is disabled or not disabled at any point in the sequence, review does not proceed to the next step. 20 C.F.R. § 404.1520(a). It is within the ALJ's lone discretion to determine whether an individual is disabled or "unable to work" under the statutory definition. 20 C.F.R. § 404.1527(e)(1).

The ALJ is required to evaluate all of the medical findings and other evidence that supports a physician's statement that an individual is disabled. The opinion of a treating or primary physician is generally given controlling weight when evaluating the nature and severity of an individual's impairments. However, no special significance is given to the source of an opinion on other issues which are reserved to the ALJ, such as the ultimate determination of disablement. 20 C.F.R. §§ 404.1527(e)(2) & 404.1527(e)(3). The ALJ has the discretion to weigh any conflicting evidence in the case record and make a determination. 20 C.F.R. §§ 404.1527(c)(2).

## B. The ALJ's Decision

The ALJ considered the medical evidence of record and testimony received at

16

the hearing, and concluded that plaintiff retains the capacity for work and is not disabled

as defined by the Social Security Act. Among her findings, the ALJ stated that the

evidence of record "strongly suggest[s] that [plaintiff] has exaggerated symptoms and

limitations. [She] has described daily activities which are not limited to the extent one

would expect, given the complaints of disabling symptoms and limitations." (Id. at 21)

For example, plaintiff has described daily activities including caring for her three year

old child, taking walks, going grocery shopping, and doing chores, despite claiming that

she rests six hours per day. (Id.) At the hearing, plaintiff got up and sat down easily,

"appeared alert and not in pain" and, at the end of the hearing, "got up slowly and

walked out stiffly, but at a normal pace." (Id.) The ALJ noted that plaintiff had a

"generally unpersuasive appearance and demeanor when testifying at the hearing."

(Id.)

> The ALJ made the following specific findings:
>
> 1. The claimant meets the nondisability requirements for a period of disability and [DIB] set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.
>
> 2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.
>
> 3. The claimant's osteogenesis imperfecta is a "severe" impairment, based upon the requirements in the Regulations (20 C.F.R. §§ 404.1520 and 416.920).
>
> 4. This medically determinable impairment does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.
>
> 5. The undersigned finds [plaintiff's] allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.
>
> 6. The claimant retains the residual functional capacity to perform a significant range of sedentary work. The claimant may never climb a ladder, rope or scaffold. She may occasionally balance, stoop, kneel, crouch and crawl. She

17

must avoid concentrated exposure to extreme cold and hazards (machinery, heights, etc.).

7. The claimant is unable to perform any of her past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

8. The claimant is a "younger individual" (20 C.F.R. §§ 404.1563 and 416.963).

9. The claimant has "a limited education" (20 C.F.R. §§ 404.1564 and 416.964).

10. The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 C.F.R. §§ 404.1568 and 416.968).

11. The claimant has the residual functional capacity to perform a significant range of sedentary work (20 C.F.R. §§ 404.1567 and 416.967).

12. Althouth the claimant's exertional limitations do not allow her to perform the full range of sedentary work, using Medical-Vocational Rule 201.28 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform. Examples of such jobs include work as an addresser, surveillance monitor or call out operator.

13. The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision [September 24, 2004] (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

(Id. at 23-24)

## C. Analysis

Plaintiff argues that the ALJ's determination was not based upon substantial

evidence because it: (1) acknowledged, but disregarded, Dr. Esham's opinion that

plaintiff was not able to sustain full time work; (2) "completely ignoted" Dr. Shapiro's

opinion, who agreed with Dr. Esham that plaintiff could not sustain full time work; and

(3) improperly relied on the state agency consultants' opinions without good reason for

doing so. (D.I. 18 at 17) Plaintiff also asserts that the ALJ improperly deemed plaintiff's

testimony about her limitations not credible. (Id.)

18

The ALJ correctly noted that, as plaintiff's treating physician, Dr. Esham's opinion is entitled to special significance and, when supported by objective medical evidence of record and consistent with other substantial evidence of record, is entitled to controlling weight. See Fargnoli v. Massanari, 247 F.3d 34, 43 (3d Cir. 2001) (citing 20 C.F.R. § 404.1527(d)(2)). The ALJ cannot disregard the opinion of a treating physician without explaining the reasoning for rejecting the opinion and referencing objective medical evidence conflicting with the opinion. See Gilliland v. Heckler, 786 F.2d 178, 184 (3d Cir. 1986).

Dr. Esham submitted a two-paragraph Medical Statement stating, in most general terms, "[a]s a result of [plaintiff's] condition and all of her symptoms, I believe that [plaintiff] is unable to sustain full time, everyday work on a regular basis." (D.I. 16 at 199A) The ALJ's opinion discussed Dr. Esham's opinion, and noted that "statements that a claimant is 'disabled,' 'unable to work,' can or cannot perform a past job, meets a Listing or the like are not medical opinions but are administrative findings dispositive of a case . . . reserved to the Commissioner." (Id. at 19) The ALJ's opinion cites Dr. Shapiro's medical findings regarding plaintiff's OI, but does not discuss his Medical Statement.[13] (D.I. 16 at 17-18) Like Dr. Esham's, Dr. Shapiro's Medical Statement is

---

[13]The court notes that plaintiff was under Dr. Shapiro's care for less than three months when he rendered his opinion; plaintiff offers no evidence in support of her proposition that Dr. Shapiro may be considered a treating physician whose opinion could be given controlling weight under equal circumstances. See 20 C.F.R. §§ 404.1502, 416.902 ("Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).").

19

also two paragraphs, provides only a general list of plaintiff's ailments, does not describe practical limitations, such as sitting, standing, and walking, and states only a legal conclusion on disability properly left to the Commissioner.[14] (Id. at 199B) Though the ALJ was remiss in not specifically iterating that she rejected Dr. Shapiro's opinion on this basis, the ALJ's rationale for disregarding Dr. Esham's opinion applies in equal force to Dr. Shapiro's opinion; the court assigns no error here.

The ALJ also fulfilled her obligation to reference objective medical evidence conflicting with Dr. Esham and Dr. Shapiro's opinions. Dr. Lifrak, after conducting a thorough examination, opined that plaintiff retained the ability to perform sedentary work. (Id. at 124-25) The ALJ cited Dr. Lifrak's opinion in her decision.

Two state agency physicians reviewing plaintiff's files concurred with Dr. Lifrak's prognosis. (Id. at 137, 166) The ALJ considered the state consultants' opinions and assigned significant weight to them because they "were based on a thorough review of the evidence" and familiarity with the legal standards, were "well-supported by the medical evidence, including the claimant's medical history and clinical and objective signs and findings as well as detailed treatment notes, which provide[ ] a reasonable basis for claimant's chronic symptoms and resulting limitations," and were "not inconsistent with other substantial evidence of record." (Id. at 19) The court agrees that the state doctors' reports reference plaintiff's medical history and provide a basis for their conclusions; in short, they contain more foundation than Dr. Esham or Dr. Shapiro's short Medical Statements. Where conflicting medical evidence is presented,

---

[14]See Knepp v. Apfel, 204 F.3d 78, 85 (3d Cir. 2000) (citing 20 C.F.R. § 404.1527(e)).

20

the ALJ may properly resolve the conflict. See Richardson v. Perales, 402 U.S. 389, 399 (1971).

In addition to the foregoing, the record contains additional evidence that supports the ALJ's determination. Dr. Hovarth, having reviewed plaintiff's medical records, agreed that plaintiff was not disabled.[15] (D.I. 16 at 140) As the ALJ noted, Dr. Balu stated in his post-examination 2003 report that plaintiff "is independent for all activities of daily living [and] community mobility." (D.I. 16 at 21, 157)

The ALJ further noted that, despite testifying that she has to rest six out of an eight hour workday, plaintiff admitted at the hearing "that she can lift her three year old, bathe and dress her and run errands." (Id. at 21) Plaintiff asserts in her papers that "these limited activities of daily living noted by the ALJ are not sufficient to question plaintiff's credibility concerning her limitations." (D.I. 18 at 24) Alhough an ALJ cannot reject "medically credited symptomatology based solely on [her] observation of [a] claimant at the hearing, and claimant's testimony that [s]he took care of h[er] personal needs, performed limited household chores" and the like, Frankenfeld v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988), the ALJ is entitled to consider this testimony. See Dass v. Barnhart, 386 F. Supp. 2d 568, 577 (D. Del. 2005) (The ALJ "is entitled to consider plaintiff's ability to clean, shop, cook, take public transportation, maintain a residence and pay bills" as well as her "ability to function outside the home") (citing 20 C.F.R. Pt. 404, Subpt. P, 12.00C & 12.00F, App. 1 (2005). In this case, the ALJ did not use

---

[15]The ALJ did not reference Dr. Hovarth's opinion. The parties cite to only two state consultants' opinions of record, and it does not appear that Dr. Hovarth executed the residual functional capacity assessment cited by the ALJ in her report.

plaintiff's testimony to reject contrary restrictions recommended by Dr. Esham or Dr. Shapiro; no such restrictions, outside of a wholesale legal conclusion that plaintiff cannot perform any work, appear of record. (D.I. at 20-21 ("Given [plaintiff's] allegations of totally disabling symptoms, one might expect to see some indication in the treatment records of restrictions placed on [plaintiff] by the treating doctors."))

Plaintiff also asserts that the ALJ was not entitled to discredit her testimony regarding her limitations. (D.I. 18 at 23, citing SSR 96-7p ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.")) Plaintiff testified that she is in too much pain to work, but also testified that she completes a range of limited activities both inside and outside of the home.[16] This conflict created a credibility determination within the purview of the ALJ.

The ALJ noted in her opinion that "[t]he record fails to show that [plaintiff] received significant active care other than for conservative routine maintenance since 2002, and there have been no significant increase[s] or changes in prescribed medication reflective of an uncontrolled condition. Additionally, [plaintiff] testified that she no longer takes pain medications as she once did." (D.I. 16 at 20) After considering plaintiff's testimony in detail as well as that of her husband and mother, the

---

[16]The court notes that plaintiff testified that, after about 15 minutes of chores inside the home, she requires a period of rest; plaintiff, however, goes to the grocery store, drives short distances, and takes her husband to doctor's visits, errands which presumably take more than 15 minutes and do not provide intermittant opportunities for rest.

ALJ found that plaintiff's "statements concerning her impairments and their impact on her ability to work are not entirely credible in light of the reports of the treating and examining practitioners and the findings made on examination," such as the examination by Dr. Balu. (Id.) "Another factor" supporting the ALJ's determination was plaintiff's "generally unpersuasive appearance and demeanor while testifying at the hearing." (Id. at 21) The ALJ's decision to discredit plaintiff's testimony, therefore, had several bases, not solely on a lack of corroborating evidence.

Finally, plaintiff asserts that the ALJ's question to the VE was improper because it did not take into account plaintiff's testimony that she is limited to walking 15 minutes, standing for 20 minutes and sitting for 45 minutes at a time. (D.I. 18 at 21) The question to the VE contemplated jobs requiring sitting for six hours out of an eight-hour day and standing or walking about two hours per day. Mathematically, this equates to the 15 minute and 45 minute alternations every hour referenced by plaintiff. Moreover, the VE testified that the addresser job has no postural demands and can be performed with a sit/stand option, such that plaintiff could alternate between the two as her condition necessitated. (D.I. 16 at 264) Therefore, even ignoring that plaintiff points to no medical evidence to substantiate her testimony that she must alternate between sitting and standing at the intervals described,[17] the ALJ's omission of this requirement

---

[17]Plaintiff points to Social Security Regulation 83-12, which states that

[i]In some disability claims, the **medical facts** lead to an assessment of RFC which is compatible with the performance of either sedentary or light work except that the person must alternate periods of sitting and standing. The individual may be able to sit for a time, but must then get up and stand or walk for awhile before returning to sitting. Such an individual is not functionally capable of doing either the prolonged sitting contemplated in the definition of sedentary work (and

23

from the question to the VE accounted for no error.

## V. CONCLUSION

For the reasons discussed above, the court finds that the Commissioner's

decision at steps four and five are supported by substantial evidence of record.

Plaintiff's motion for summary judgment (D.I. 17), therefore, is denied and defendant's

motion for summary judgment (D.I. 21) is granted.  An appropriate order shall issue.

---

for the relatively few light jobs which are performed primarily in a seated position)
or the prolonged standing or walking contemplated for most light work. (Persons
who can adjust to any need to vary sitting and standing by doing so at breaks,
lunch periods, etc., would still be able to perform a defined range of work.)

(Emphasis added)  Plaintiff points to no medical opinions of record which describe such
a limitation.